Filed 3/11/15  Kocarslan v. City of Palos Verdes Estates CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DESIRE MELI KOCARSLAN, | B253026 |
| Petitioner, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BS136691) |
| v. | |
| CITY OF PALOS VERDES ESTATES, | |
| Respondent, Cross-complainant and Respondent. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Luis Lavin and Barbara A. Meiers, Judges.  Affirmed.

Law Office of Laleh Ensafi and Laleh Ensafi, for Petitioner, Cross-defendant and Appellant.

Jenkins & Hogin, Christi Hogin and Tarquin Preziosi, for Respondent, Cross-complainant and Respondent.

_____

Appellant Desire Kocarslan applied for an "after-the-fact" coastal development permit (CDP) for two concrete decks she had constructed near the edge of a coastal bluff. The City of Palos Verdes Estate denied the permit, concluding that the decks were "visually intrusive" and did not meet the requirements set forth in the municipal code or the California Coastal Act. Kocarslan filed a petition for writ of mandate and Palos Verdes filed a cross-complaint for injunctive relief. The trial court denied the petition for writ of mandate and entered a judgment ordering Kocarslan to remove the decks within 30 days. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Summary of Statutes Regulating Development in the Coastal Zone*

The California Coastal Act (see Pub. Res. Code, §§ 30000 - 30900) requires a "coastal development permit" (CDP) for any "development" within "the coastal zone," which includes all "land and water area of the State of California . . . extending seaward to the state's outer limit of jurisdiction . . . and extending inland generally 1,000 yards from the mean high tide line of the sea."[1] (Pub. Res. Code, §§ 30103, 30600, subd. (a).) The Act defines "development" to include (among other things) "the placement or erection of any solid material or structure" and the "construction, reconstruction, demolition, or alteration of the size of any structure." (Pub. Res. Code, § 30106.)

"The Coastal Act expressly recognizes the need to 'rely heavily' on local government '[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility . . . .' [Citation.] As relevant here, it requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. [Citations.] Once the California Coastal Commission certifies a local government's program, and all

---

[1] The coastal zone extends further inland in "significant coastal estuarine, habitat and recreational areas," reaching to "the first major ridgeline paralleling the sea or five miles from the mean high tide line of the sea, whichever is less." (Pub. Res. Code, § 30103, subd. (a).)

implementing actions become effective, the commission delegates authority over coastal development permits to the local government. [Citations.] . . . An action taken under a locally issued permit is appealable to the commission. [Citation.] Thus, '[u]nder the Coastal Act's legislative scheme, . . . the [local coastal program] and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy.' [Citation.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 794.)

The City of Palos Verdes Estates's (Palos Verdes) certified local coastal program (LCP) is set forth in title 19 of the Palos Verdes Estates Municipal Code (PVEMC).[2] Chapter 19.02 sets forth the procedures for obtaining a CDP for "proposed development in the coastal zone." (§ 19.02.010.) Like the Coastal Act, the PVEMC defines the term "development" to include "the placement or erecting of any solid material or structure" and "construction, reconstruction, demolition, or any alteration of the size of any structure." (§ 19.01.070.) The purpose of the CDP permitting process is to: "[p]rotect[] the coastal bluffs and the marine environment as delicate natural resources"; "[p]rotect[] undeveloped natural land in open space available for visual and physical enjoyment by the public"; and "[a]ssur[e] that the coastal bluffs can support proposed private development." (§ 19.02.010, subds. (A)-(C).)

Section 19.02.040 prohibits Palos Verdes from issuing a CDP unless it affirmatively finds that: (1) "the plans for the proposed development and the [CDP] comply with all of the requirements of [chapter 19.02] and other relevant city ordinances and development standards"; (2) "[t]he proposed use will not be visually intrusive from public view points" in the coastal zone;[3] and (3) the "required reports and plans demonstrate to the satisfaction of the city, in its sole discretion, that the proposed use can

---

[2]    Unless otherwise noted, all further statutory citations are to the PVEMC.

[3]    The PVEMC defines "public view points" as "any publicly owned . . . location in the coastal zone to which the public has access and from which it can view development in the coastal zone." (§ 19.01.145.)

be supported by the bluff and the proponent has demonstrated that the proposed use will not increase any existing geologic hazards." (§ 19.02.040, subds. (A)(1), (3) & (4).)

Section 19.02.020, subdivision (D) sets forth specialized requirements for "[s]tructures . . . within twenty five feet . . . of the Bluff edge."[4] (§ 19.02.020, subd. (D).) The subdivision states that such structures may only be constructed "after preparation of a geologic report" and "findings by the City that the proposed structure . . . (1) poses no threat to the health, safety and general welfare of persons in the area by reason of identified geologic conditions which cannot be mitigated and (2) the proposed structure . . . will minimize alteration of natural landforms and shall not be visually intrusive from public view points in the coastal zone."

The subdivision lists four factors used to assess visual intrusiveness, explaining that "development shall not be considered visually intrusive if it incorporates the following to the maximum extent feasible: [¶] 1. The development is sited on the least visible portion of the site as seen from Public View points. [¶] 2. The development conforms to the scale of existing surrounding development. [¶] 3. The development incorporates landscaping to soften and screen structures. [¶] 4. The development incorporates materials, colors, and/or designs which are more compatible with natural surroundings."

### B. *Summary of the Permit Application Proceedings*

#### 1. *Kocarslan's application for a CDP and the Planning Commission hearing*

Desire Kocarslan owns a single-family house on property that abuts coastal bluffs overlooking the Pacific Ocean. The front of the house, located at 605 Paseo Del Mar, faces the street. The rear of the house opens onto a large, flat grass yard that extends to a Bluff edge. In 2006, Kocarslan constructed two concrete decks located along the Bluff edge in the northwest and southwest corners of the property. The northwest deck

---

**4** The terms "Bluff" and "Bluff edge" are defined in sections 19.01.030 and 19.01.040 of the PVEMC. Kocarslan does not dispute that the decks at issue in this case are within 25 feet of a "Bluff edge."

4

contained "an above ground hot tub" and the southwest deck included a "large" built-in grill.

In July of 2010, Allan Rigg, the Director of Public Works and Planning for Palos Verdes, sent a letter notifying Kocarslan that the city had no record of issuing a CDP for either of her decks. Rigg requested that Kocarslan immediately provide copies of her development plans, any associated geologic reports and her permits. Fifteen months later, Palos Verdes sent Kocarslan a second letter ordering her to either "remove both non-permitted concrete decks from the bluff tops" or "seek approval through the Palos Verdes Estate Planning Commission for a [CDP]."

On October 12, 2011, Kocarslan filed an application for a CDP. The accompanying development plans showed that both decks were over six feet in height, approximately 425 square feet in size and positioned within eight feet of the Bluff edge. Each deck was surrounded by three-and-a-half foot stone pillars that served as a protective railing. After receiving the application, Palos Verdes associate planner Stacey Kinsella sent an email to a project manager of the California Coastal Commission stating: "We recently took in a submission for two decks already built approximately 8 ft. away from the bluff's edge here in [Palos Verdes]. Knowing that the Coastal Commission likes structures to be a minimum of 25 ft. from the bluff's edge, staff would like some informal feedback before presenting to the [Palos Verdes] Planning Commission." The Coastal Commission manager informed Kinsella "it would be unlikely that the Commission staff would recommend approval of structures this close to the bluff edge."

Prior to the Planning Commission hearing, Kinsella prepared a memorandum reporting that Kocarslan had submitted a geological report in support of the development that had been approved by the Palos Verdes city geologist. Kinsella emphasized, however, that the Coastal Commission was unlikely to support a CPD "[d]ue to the proximity of the decks to the bluff." She further noted that the decks "exceeded the maximum allowable height of 6.5 ft." The memorandum was accompanied by several photographs of the decks and surrounding property.

5

On January 17, 2012, the Palos Verdes Planning Commission held a hearing on the application. Director Rigg testified that the Coastal Commission generally denied a CDP for "structures within the 25 foot setback of the bluff tops." Although Rigg indicated the Planning Commission was required to apply the criteria set forth in the Palos Verdes LCP when making its decision, he noted that any "decision to approve the project would be appealable by the Coastal Commission, who has asked for and routinely enforced the 25-foot setback for major structures on the bluffs." Rigg also confirmed that the city geologist had reviewed Kocarslan's geology report and determined the structures did not threaten the stability of the cliffs.

The chair of the Planning Commission reiterated that the Coastal Commission had "fairly consistently taken the position not to approve structures within that 25-ft. setback," deeming any such structures to be "visually intrusive." The city attorney agreed with these comments, explaining that "while there [wa]s no written policy used by the Coastal Commission which specifies 25 [feet]," the Coastal Commission had regularly deemed any "structures within that area . . . [to be] visually intrusive." Director Rigg confirmed that the 25-foot setback "was not codified."

Kocarslan's representative at the hearing, Roger Arroyo, stated that he had spoken with the Coastal Commission and been informed that although no written provision required a 25-foot setback, the Commission normally sought such a condition in areas that were not governed by a local LCP. Arroyo also asserted that many of Kocarslan's neighbors had structures within 25 feet of the bluff edge.

After Arroyo spoke, Planning Commission King noted that he believed the decks were inconsistent with the "aesthetic prong of the City's Local Coastal Plan" due to their proximity to the bluff edge. Several other commissioners agreed, explaining that the Planning Commission would have probably requested that the decks be "pulled back from the bluff" if Kocarslan had sought a permit prior to construction.

At the end of the hearing the five-member Planning Commission voted unanimously to adopt a resolution denying Kocarslan's permit application. The resolution stated that the Planning Commission found the proposed use to be "visually

6

obtrusive from public viewpoints" and "inconsistent with the . . . the Coastal Commission's policy of disapproving structures within 25 feet of thee Bluff's Edge." Kocarslan appealed the decision to the Palos Verdes City Council.

### 2. *The City Council hearing on Kocarslan's appeal*

In preparation for Kocarslan's appeal, Alan Rigg prepared a memorandum for the City Council summarizing the proposed development and the Planning Commission proceedings. The memo was accompanied by additional pictures of the property, including aerial views of the decks and comparative photos taken before and after the decks were constructed atop the bluff.

At the hearing, Director Rigg informed the City Council that "concerns were raised [at the Planning Commission hearing ] regarding the location of the decks in relationship to the bluff's edge and the incompatibility of the decks with the natural surroundings, and the visual intrusiveness from the public viewpoints." Rigg explained the application had been denied because the LCP required that any development within 25 feet of the Bluff edge must be "made as visually unobtrusive as possible, and that they're located on the property in the location whether they'll create the least amount of impacts. . . [T]he planning commission found neither of these two findings could be made."

During questioning from the City Council, Rigg confirmed that the LCP allowed Palos Verdes to issue a "permit [for] structures within 25 feet of the bluff edge under limited circumstances." Palos Verdes Mayor John Rea stated that he knew "from prior experiences that [the decks] c[ould] be seen from the ocean" and inquired whether this qualified as a "a public view point within the coastal zone." Director Rigg confirmed that landward views from the ocean did qualify and were an "important" aspect of the Coastal Act. Rigg also stated that, in his opinion, the photographs and evidence made clear that moving the decks back from the Bluff edge would "dramatically reduce the visual obtrusiveness."

7

Kocarslan's representative, Roger Arroyo, argued that the Planning Commission had erred by basing its decision on the Coastal Commission's unwritten 25-foot offset policy rather than on the standards set forth in the Palos Verdes LCP. Arroyo also argued that several other individuals had been permitted to build structures within 25 feet of the Bluff edge. Kocarslan also spoke at the hearing, informing the Council that her contractor had told her she did not need permits for the decks. Kocarslan also stated that she did not believe the decks were impacting the public because they could only be seen by her and "the boats on the ocean."

After the parties completed their presentations, Councilperson Ellen Perkins stated that she had visited the property and was "wrestling with [whether] or not the decks were visually intrusive," noting that they could only be viewed from "boats along the ocean." She further stated, however, that the before and after photographs demonstrated "the extent to which the existing decks are visually intrusive." Perkins also stated that the "stark" materials used to build the decks were not compatible with the natural surroundings and that the "th[e] particular design" of the decks was as problematic as their location. She expressed further concern that, based on her personal observations, the decks "could destabilize and erode [the bluffs] fairly easily."

Perkins also addressed the Coastal Commission's 25-foot setback policy, stating that the Council's decision should not be "shape[d]" by any beliefs about how the "[C]oastal [Co]mmission . . . would rule" in the matter." Rather, she believed that the CDP should be denied because the "decks do not incorporate to the maximum extent feasible those characteristics [listed in PVEMC]" and because "if [the plans came] forward . . . today . . . we would want to see [the decks] further back [and] . . . with natural materials."

Councilperson Rosemary Humphrey articulated similar thoughts, stating that she would vote to approve the Planning Commission's resolution because she could "not make a finding that [the decks] do[] not intrude on the aesthetic viewpoint." Humphrey also expressed concern that the aesthetic aspects of the project could not be addressed

8

through landscaping because Palos Verdes generally discouraged owners from irrigating near the bluffs.

Councilperson George Bird stated that he had visited the property to "get a sense of "visual aesthetics" and believed that the decks presented a "pronounced visual obtrusiveness." Bird emphasized that "the aesthetics" did not meet the requirements "set forth in the LCP." Bird further noted that if Kocarslan had applied for permits prior to construction, he would have requested that the "decks [be] pushed closer to the home" and that "different materials [be used for] . . . these two decks because it is inconsistent [with the LCP]."

Councilperson Jim Goodhart noted that, aside from their visual intrusiveness, the decks were in violation of the municipal building code because they exceeded maximum height limitations and because Kocarslan did not have permits for the utilities (electricity and gas) that were apparently extended out to the decks.

Finally, Mayor John Rea questioned whether the aesthetics could be addressed by growing hedges around the structures. Although Rea acknowledged the City Council had received "anecdotal reports that the [Coastal] Commission never, ever approves anything within 25 feet [of the Bluff edge]," he believed the Council was nonetheless required to follow its "municipal code," which did not include any such requirement.

At the conclusion of the hearing, the Council voted 5-0 to approve the Planning Commission's denial of the CDP. On March 13, 2012, the Council issued Resolution No. R12-04 (the Resolution), which determined that the decks did "not comply with the requirements of PVEMC § 19.02." Sections 1 through 4 of the Resolution provided a procedural history of the case, summarizing Kocarslan's application for the CDP, the Planning Commission proceedings and the City Council hearing. Section 4 listed the evidence the Council had considered in reaching its decision, which included a "written staff report [containing] . . . the appeal, plans, and visual presentations; written and oral testimony of [Kocarslan]; and documentary evidence, including the minutes of the Planning Commission hearing."

9

Section five listed the factual findings the City Council had made "based on the evidence presented." First, the Council found that the decks were located within 25 feet of the Bluff edge. Second, it found that the decks were "visually intrusive from public viewpoints" within the meaning of sections 19.02.020 because: "the decks are built approximately 7 to 8 ft. from the bluff top and . . . therefore not located on the least visible portion of the site"; "the decks are not compatible with the natural surroundings and do not maintain the natural state of the bluff top"; "the development does not conform to the scale of the existing approved development within the Bluff's Edge." Third, the Council found that the location of the decks was "inconsistent with . . . the Coastal Commission policy of disapproving structures within 25 feet of the Bluff's Edge." Fourth, the location of the decks presented a "risk of significant impact from future erosion of the bluff." Fifth, "given the large lot size," there were "alternative locations available on the property where the decks [could] be constructed further from the bluff's edge which would mitigate impacts to public viewpoints and erosion concerns." Sixth, the decks would not have been approved if a CDP had been sought "before the decks were constructed"

Section six set forth the Council's decision, explaining that "[b]ased on the [factual] findings," the Council had concluded the proposed use did not comply with the Palos Verdes LCP. The Resolution noted that each of the Council's factual findings would, "considered alone," have been "sufficient to support its determination . . . to deny the appeal, and that [the City Council] would have made the same determination had only one of such findings been presented . . . ." The Resolution directed Kocarslan to immediately remove any "structures constructed in the Coastal Zone . . . without a permit."

### C. Trial Court Proceedings

#### 1. Kocarslan's petition for writ of mandate and Palos Verdes's cross-claims

On April 9, 2012, Kocarslan filed a petition for writ of mandamus seeking an order "directing [Palos Verdes] to allow the decks to remain." The petition alleged the

10

City Council had erred in concluding that a CDP was necessary to construct the concrete decks. Alternatively, the petition alleged the Council had abused its discretion in denying a CDP because the "the evidence d[id] not support" the findings and conclusions set forth in the Resolution.

Palos Verdes filed a cross-complaint asserting claims for violation of the PVEMC, violation of the Coastal Act and public nuisance. Each claim was predicated on Kocarslan's construction of two concrete decks "without a City-issued building permit or CDP." The cross-complaint requested declaratory and injunctive relief directing Kocarslan to remove "any structures within the coastal zone that were installed without a valid CDP issued by the City." The cross-complaint also sought civil penalties under Public Resources Code section 30820, which permits the trial court to impose a fine of $500 to $30,000 against any person who performs any development that violates the Coastal Act and allows additional daily fines for any person who "intentionally or knowingly" undertakes development in violation of the Act. (See Pub. Res. Code, § 30820, subs. (a) & (b).)

In June of 2012, Kocarslan filed a memorandum in support of her writ petition arguing that it was "debatable" whether she was required to obtain a CDP under the PVEMC and the Coastal Act. According to Kocarslan, the statutes did not adequately explain what constituted a "structure" or "development." She further argued that even if the decks were "considered structures [or] development, . . . they [were] exempt because they are located in the backyard of an existing large structure – a home." In support, Kocarslan cited PVEMC section 19.01.080, which "excludes from the definition of development improvements to an existing single family residence under California Code of Regulations 13250."

Kocarslan argued that even if Palos Verdes correctly concluded a CDP was required, the City Council had violated the requirements set forth in *Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 (*Topanga*) by failing to adequately explain the basis for denying a permit. She also argued that the Council had improperly based its decision on an invalid "underground" Coastal

11

Commission regulation that prohibited all development within 25 feet of the Bluff edge. Finally, Kocarslan argued there was "no evidence" supporting the Council's finding that the decks were "visually intrusive" within the meaning of PVEMC sections 19.02.020 of 19.02.040.

In its opposition, Palos Verdes argued that the concrete decks fell within the PVEMC and Coastal Act's definition of "development," which included any "structure" or "solid material" constructed within the coastal zone. Palos Verdes also argued that the section 19.01.080 exemption for improvements to single-family residences did not apply to any structures "within 50 feet of the edge of a coastal bluff." (14 Cal. Code Regs. § 13250, subd. (b)(1).)

Palos Verdes also argued that substantial evidence supported the City Council's finding that the decks were "visually obtrusive." Palos Verdes argued that the photographs and the City Council's own visual inspection confirmed that: (1) the decks were visible from the ocean; (2) no effort had been made to place the decks in the least visible portion of the property; (3) the decks did not incorporate materials compatible with the natural surroundings; and (4) no landscaping was used to shield the structures from view.

Prior to the hearing on her petition, Kocarslan filed a "motion for view of property" arguing that the trial court should visit the property because "the entire case is based upon the issue of whether the . . . two decks in the backyard of [the] home are visually intrusive within the meaning of the [PVEMC]. . . . Th[e] court should be in the same position that the Council members were in when the Council members took evidence in the case by a view of the site." Kocarslan further asserted that "the refusal to look at the property itself when authorized to do so by Code of Civil Procedure Section 651 would constitute an abuse of discretion. "

On August 29, 2012, the court issued an order denying Kocarslan's motion to view the property and her petition for writ of mandate. The order stated that the court elected not to view the property because its review of the City Council's decision was properly "limited to the administrative record." On the petition, the court ruled that the

12

PVEMC and the Coastal Act required Kocarslan to obtain a CDP prior to constructing the decks: "Based on common-sense and a review of the photographs of the property, the two decks are clearly permanent 'structures' which required permits before they were constructed." The court also ruled that the Resolution satisfied the requirements of *Topanga, supra,* 11 Cal.3d 506, because it set forth both the "reasoning and the evidence that [the City Council had] relied upon in reaching its conclusions."

The court further concluded that substantial evidence supported the City Council's decision to deny the CDP. The court found "certain aspects of the Resolution problematic," including Palos Verdes's apparent reliance on an unwritten Coastal Commission policy requiring a "25-foot setback" from coastal bluffs. The court was also troubled by the City Council's findings on "erosion concerns," which "appear[ed] to be based solely on the personal conjectures and lay-person experience of the City Council members and is contrary to the report of the City geologist."

The court "ultimately" concluded, however, that "because there is substantial evidence that the decks are visually intrusive, the City was justified in denying the permit pursuant to [PVEMC section] section 19.02.040, subdivision (A)." The court noted that the administrative record contained evidence that the decks were visible from the ocean, which qualified as a public view point within the coastal zone. The court further noted that the "photographs . . . clearly show[ed] how visually intrusive [the decks] actually are in the common-sense understanding of the term." The court emphasized that the decks were positioned "close to lip of the bluff" and constructed of "ornate white [stone]" that contrasted with the "natural surroundings."

### 2. *Palos Verdes's motion for summary judgment*

Approximately three months after the court denied the writ petition, Palos Verdes moved for summary judgment on its cross-complaint. Palos Verdes argued that, in light of the court's ruling on the writ petition, Kocarslan was now collaterally estopped from challenging the denial of a CDP. Palos Verdes further asserted that "[n]o further

13

evidence or factual determinations [were] necessary . . . to find [Kocarslan] in violation of the City's Municipal Code and the Coastal Act."

In her opposition, Kocarslan argued she was entitled to a trial on "whether the decks are visibly intrusive from the ocean." Kocarslan contended that "all this Court needs to at a trial [*sic*] is determine either from photographs, a personal view of the site, or both that the two decks are not visibly intrusive from the ocean." Her entire opposition was predicated on the assertion that the trial court had a duty to independently reevaluate whether the decks were in fact visually intrusive within the meaning of the PVEMC.

On September 26, 2013, the trial court granted the motion for summary judgment, explaining: "[t]he issue of whether coastal development and building permits were required for the decks was litigated and conclusively decided in the writ proceeding." As a result, Kocarslan was "collaterally estopped from re-litigating" those matters. The court further ruled that Palos Verdes's first, second, third, and fourth causes of action were all based on Kocarslan's act of constructing the decks without a CDP, which constituted a violation of the PVEMC and the Coastal Act. The court found that because Palos Verdes had "conclusively established that a [CDP] was required for the decks and that Kocarslan never obtained the required permit[,] . . . the City is entitled to declaratory and injunctive relief requiring the removal of the decks." The court declined, however, to impose civil penalties under Public Resources Code section 30820. The court also ruled that under PVEMC section 8.48.015, subdivision (A), any violation of Palos Verdes's local coastal program was "defined as a public nuisance," thereby entitling Paso Verdes to "injunctive relief ordering Kocarslan to abate the nuisance on her property by removing the decks."

## DISCUSSION

Kocarslan raises five issues on appeal. First, she asserts that the City Council's Resolution failed to adequately explain the basis for its decision, thereby violating the requirements of *Topanga, supra,* 11 Cal.3d 506. Second, she contends the trial court

14

erred in concluding that the Coastal Act and the PVEMC required her to obtain a CDP for the decks.  Third, she argues there is insufficient evidence to support the City Council's finding that the decks are "visually intrusive" within the meaning of the PVEMC.  Fourth, she contends the City Council's decision was predicated on an invalid "underground" Coastal Commission regulation prohibiting development within 25 feet of the Bluff edge.  Fifth, she asserts the trial court abused its discretion by refusing to admit into evidence photographs that were not part of the administrative record.

### A.  Standard of Review

Code of Civil Procedure section 1094.5 "structures the procedure for judicial review of adjudicatory decisions rendered by administrative agencies."  (*Topanga, supra*, 11 Cal.3d at p. 514.)  In a proceeding challenging the validity of a final administrative order, a trial court's review is limited to the question of whether the administrative agency proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was a prejudicial abuse of discretion.  A prejudicial abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.  (Code Civ. Proc., § 1094.5, subd. (b).)

We review the trial court's findings and decision for substantial evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.)  Under this standard, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the trial court judgment.  (*Moran v. Board of Medical Examiners* (1948) 32 Cal.2d 301, 308-309.)

### B.  The City Council's Resolution Satisfies the Requirements of Topanga

Kocarslan argues that the City Council's Resolution fails "to accurately or intelligibly explain how the [Council's] finding[s] support[ its] conclusions," thereby "contraven[ing]" the requirements of *Topanga, supra,* 11 Cal.3d 506.

In *Topanga*, our Supreme Court explained that Code of Civil Procedure section 1094.5 contains an "implicit . . . requirement that the agency which renders the

15

challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga, supra,* 11 Cal.3d at p. 515.) The Court has clarified that "[t]he findings do not need to be extensive or detailed. '"[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision . . . the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].'"' [Citation.] On the other hand, mere conclusory findings without reference to the record are inadequate." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516-517; *Sierra Club v. California Coastal Com.* (1993) 19 Cal.App.4th 547, 556 ["While a reviewing court must make certain an agency has adequately disclosed its reasoning process, . . . 'administrative findings need not be as precise or formal as would be required of a court [citation].' [Citation.]"].) A primary "purpose of requiring administrative tribunals to make findings is to permit meaningful judicial review." (*Pick v. Santa Ana-Tustin Community Hospital* (1982) 130 Cal.App.3d 970, 978.)

The Resolution initially summarizes the categories of evidence the City Council considered in making its determination, including the written staff report, Kocarslan's design plans, photographs of the property, the written and oral testimony of the hearing participants and the Planning Commission's hearing transcript and materials. All of this evidence is contained in the administrative record. The Resolution then lists the factual findings that the City Council derived from this evidence, including (in part) that: (1) the decks were visible from public view points due to their size and close proximity to the Bluff edge; (2) the decks could have been placed further from the Bluff edge, where they would have been less visible; and (3) the decks were constructed of materials that did not conform to the natural surroundings. Finally, the Resolution explains that, based on these factual findings, the City Council denied the CDP because the decks were visually intrusive within the meaning of the PVEMC, inconsistent with the Coastal Commission's 25-foot setback policy and likely to increase erosion.

16

The Resolution is sufficient to demonstrate "the analytic route the administrative agency traveled from evidence to action." (*Topanga, supra,* 11 Cal.3d at p. 515.) It identifies the evidence that was considered, explains the factual findings that were derived from that evidence and explains how the factual findings supported its decision. Thus, the Resolution does not leave us to "speculate as to the basis of the [City Council's] decision," but rather provides "road signs" enabling us to "trace and examine the agency's mode of analysis." (*Id.* at pp. 515-516.)

### C. *The Trial Court Did Not Err in Concluding that Kocarslan Required a CDP to Construct the Decks*

Kocarslan next argues that the trial court erred in concluding that she was required to obtain a CDP prior to constructing the decks. Kocarslan does not challenge the trial court's conclusions that: (1) the Coastal Act and the PVEMC require a CDP for any "development" within the coastal zone; and (2) the decks are located within the coastal zone. She asserts, however, that "[i]t is not clear from the code, whether the decks at the rear of the . . . home are considered structures [or] developments." She further asserts that even if the decks do qualify as "development," they are nonetheless exempt from the permit requirement under PVEMC section 19.01.080. Both arguments are without merit.

The Coastal Act and the PVEMC broadly define the term "development" to include "[t]he placement or erecting of any solid material or structure." (PVEMC 19.01.070; Pub. Res. Code, § 30106.) The two decks, both over four hundred square feet and constructed of stone and concrete, are a form of "solid material" that has been placed in the coastal zone. Both decks also qualify as a "structure," commonly defined to mean "something constructed or built." (Webster's Third New International Dictionary (1981) p. 2267.)

It is also clear that the decks do not fall within PVEMC section 19.01.080, subdivision (A), which excludes from the definition of development "Improvements to existing single-family residences, pursuant to California Code of Regulations Section 13250." Although section 13250, subdivision (a) exempts "[s]tructures on the property

17

normally associated with a single-family residence, such as garages, swimming pools, fences, and storage sheds," subdivision (b) clarifies that a CDP is required for any improvement "to a single-family structure if the structure or improvement is located . . . within 50 feet of the edge of a coastal bluff." (14 Cal. Code. Regs. § 1325, subd (b)(1).) Thus under subdivision (b), the general exclusion from CDP requirements for improvements associated with a single-family residence does not apply where, as here, the improvement is within 50 feet of a coastal bluff edge.

### D. Substantial Evidence Supports the City Council's Finding that the Decks Are Visually Intrusive Within the Meaning of PVEMC Sections 19.02.020 and 19.02.040

Kocarslan argues there is insufficient evidence to support Palos Verdes's finding that the concrete decks are "visually intrusive from public viewpoints in the coastal zone." Section 19.02.020, subdivision (D) prohibits the construction of any structure within 25 feet of the Bluff edge unless Palos Verdes makes an affirmative finding that the "proposed structure . . . will minimize alteration of natural landforms and shall not be visually intrusive from public view points in the coastal zone." The section also provides criteria for assessing visual intrusiveness, explaining: "[D]evelopment shall not be considered visually intrusive if it incorporates the following to the maximum extent feasible: [¶] (1) The development is sited on the least visible portion of the site as seen from public view points; [¶] (2) The development conforms to the scale of existing surrounding development; [¶] (3) The development incorporates landscaping to soften and screen structures; [¶] (4) The development incorporates materials, colors, and/or designs which are more compatible with natural surroundings."[5]

---

[5] Section 19.02.040, subdivision (A) prohibits Palos Verdes from approving a CDP for any development that does not comply with the local coastal program, including the requirements set forth in section 19.02.020. Section 19.020.040 includes a separate subdivision stating that a CDP may not be issued for any development unless the City makes an "affirmative finding[] that: [¶] . . . [¶] [t]he proposed use will not be visually intrusive from public view points." Thus, Palos Verdes's LCP prohibits any structures in

18

The language of the PVEMC and Coastal Act makes clear that views from the ocean toward the coastline qualify as a "public view point." The PVEMC defines "[p]ublic view point" as "any publicly owned . . . location in the coastal zone to which the public has access and from which it can view development in the coastal zone." (PVEMC, § 19.01.145.) The term "coastal zone" is defined to include "that land and water area . . . identified in . . . [Public Resources Code section] 30103." (PVEMC, § 19.01.060.) Public Resources Code section 30103, in turn, defines "coastal zone" as "that land and water area of the State of California . . . extending seaward to the state's outer limit of jurisdiction, including all offshore islands, and extending inland generally 1,000 yards from the mean high tide line of the sea." Under the federal Submerged Lands Act (43 U.S.C. §§ 1301 et seq.), California has jurisdiction over coastal water extending three nautical miles from its coastline. (43 U.S.C. § 1312.) Considered together, these authorities make clear that view points from the ocean, toward the land, qualify as public view points within the coastal zone.

During the City Council hearing, council members discussed several of the criteria set forth in section 19.02.020, subdivision (D), noting that: (1) the decks were clearly visible from the ocean, which qualified as a public view point within the coastal zone; (2) the decks could have been positioned further back from the Bluff edge, thereby making them less visible; (3) the design and materials of the decks were not compatible with the natural surroundings.

Substantial evidence in the record supports each of these factual findings. The development plans show that each deck is over six feet high, covers an area of over 400 square feet and is surrounded by columns that are three-and-a-half feet tall. The plans also show each deck is within eight feet of the Bluff edge. There are numerous photographs of the decks, which show that the structures are constructed of concrete or a light-colored stone and bordered by ornate stone columns. The photographs also show that the decks are positioned very close to the Bluff edge, overlooking the ocean, and that

the coastal zone (even those not within 25 feet of the Bluff edge) that are visually intrusive from a public view point within the coastal zone.

19

there is no landscaping shielding the decks from view.  At the hearing, Kocarslan stated that people on boats could see the decks and Mayor Rea indicated he had personally viewed the decks from the ocean.  Based on all of this evidence, the City Council could reasonably conclude the decks were visible from the ocean.

The photographs also show that the decks could have been placed further from the Bluff edge, reducing their visibility from the ocean.  The photographs show a large, flat grass lawn extending from the back of the house to the Bluff edge.  These images confirm Kocarslan could have placed the decks closer to the home, rather than the Bluff's edge, where they were most visible from the ocean.

The photographs also support the City Council's findings that Kocarslan failed to incorporate designs or materials that were compatible with the natural landscape.  As noted by Councilman Perkins, the before and after pictures illustrate the extent to which the decks altered the landscape of the bluffs.  The photographs also show that the light-colored stone and three-and-a-half foot columns extending up from the deck contrast sharply with the surrounding vegetation.  The images also demonstrate that Kocarslan did not incorporate any landscaping to soften or screen the decks from the ocean.

In addition to the photographs and development plans, the administrative record contains evidence that several council members viewed the premises.  The information they obtained "from such inspection and view of the premises is itself evidence." (*Orchard v. Cecil F. White Ranches* (1950) 97 Cal.App.2d 35, 41.)  Although the record does not disclose exactly what the council members saw, we "are required to presume" that the visual information they gathered during their viewing supported the Council's factual findings.  (*Downey v. Santa Fe Transp. Co*. (1955) 134 Cal.App.2d 720, 715.)

In sum, the record contains substantial evidence that: (1) the decks were visible from a public view point within the coastal zone; (2) the decks could have been placed in an area of the property where they would have been less visible; and (3) the design of the decks and the materials used to build them were not compatible with the natural landscape.  Considered together, these factors are sufficient to support the City Council's

20

ultimate finding that the decks were visually intrusive within the meaning of the PVEMC.**6**

### E. Any Reliance on the Coastal Commission's Alleged "Underground Regulation" was Harmless

Kocarslan next argues that the City Council abused its discretion in denying the CDP because it relied on an "unwritten [California Coastal Commission] policy regarding a 25 foot setback for major structures on the bluffs."  In support, she cites the following language in section 5, subdivision (e) of the Resolution: "The locations of the decks are inconsistent with the . . . Coast Commission's policy of disapproving structures within 25 feet of the Bluff's Edge."

During the Planning Commission and City Council hearings, several Palos Verdes officials referred to this alleged policy, asserting that the Coastal Commission would likely deny a CDP for the decks based on an unwritten and non-codified prohibition against any development within 25 feet of a Bluff edge.  Kocarslan argues these statements show the denial of her permit was based on an invalid "underground regulation" that was not promulgated in accordance with the rulemaking procedures set forth in the Administrative Procedure Act.  (See generally *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 332 [describing APA rulemaking procedural requirements]; *California Grocers Assn. v. Department of Alcoholic Beverage Control* (2013) 219 Cal.App.4th 1065, 1068 ["The APA sets forth procedures for the adoption of

---

**6** In her opening brief, Kocarslan provides an internet link to a Coastal Commission memorandum named "Protecting Views from the Ocean Under the Coastal Act" (available at http://www.coastal.ca.gov/lu/views.pdf).  The memorandum asserts that "protection of landscape views from state ocean waters" is a proper consideration in deciding whether to issue a CDP.  The memorandum also summarizes various cases in which the Coastal Commission has imposed conditions on development to mitigate impacts on landward views from the ocean.  Kocarslan argues that the memorandum's case summaries are "instructive as to what in reality is an intrusive view" and demonstrate that the decks at issue here are not intrusive.  The memorandum is not part of the administrative or trial court record and Kocarslan has not filed a motion requesting that we take judicial notice of the document.  Accordingly, we do not consider it.

21

an administrative regulation and provides that a failure to do so voids the agency action"].).

Although the trial court agreed that the City Council's apparent reliance on an unwritten policy of the Coastal Commission was "problematic," the court ultimately concluded that any error was harmless because the City "was justified in denying the permit" based on the fact that the decks were "visually intrusive." We agree with the trial court's analysis.

"'A writ of administrative mandamus will not be issued unless the court is persuaded that an abuse of discretion was prejudicial. [Citation.] In other words, the reviewing court will deny the writ, despite abuse of discretion, if the agency's error did not prejudicially affect the petitioner's substantial rights.' [Citations.]" (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200].) As explained above, substantial evidence supports the City Council's finding that the decks were visually intrusive and therefore not eligible for a CDP under the standards set forth in PVEMC sections 19.02.020 and 19.02.040. The Resolution contains language clarifying that each of the factual findings set forth in section 5 would, considered alone, have been sufficient to deny the CDP and that the City Council would have "made the same determination had only one of such findings been presented in this situation." Thus, although the Resolution's factual findings reference the Coastal Commission's allegedly unwritten 25-foot setback policy, the City Council made clear that it would have rendered the same decision based solely on the ground of visual intrusiveness.

### F. *The Trial Court Did Not Err in Excluding Evidence Outside the Administrative Record*

Kocarslan argues that the trial court "abused its discretion" by "refusing to admit" various photographs of the decks and the surrounding property to aid the court in assessing the writ petition and Palos Verdes's motion for summary judgment. The trial court refused to admit the evidence because it was not part of the administrative record.

In a proceeding challenging the validity of a final administrative order, "'"evidence outside the administrative record generally is inadmissible to show that the agency has not proceeded in the manner required by law. [Citation.] [E]xtra-record evidence is [only] admissible if the proponent shows that the evidence existed before the agency made its decision, but that it was impossible in the exercise of reasonable diligence to present it to the agency before the decision was made. [Citation.]'" [Citation.]" (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 930.)

Kocarslan has neither presented any argument why the photographs at issue could not have been introduced during the administrative proceedings, nor has she presented any reason why the general rule prohibiting evidence outside of the administrative record is inapplicable to this case.[7]

---

[7] Kocarslan also argues that the court erred in granting Palos Verdes judgment on its cross-claims for violation of the Coastal Act, the PVEMC and public nuisance. The trial court concluded that, in light of the writ proceedings, there was no triable issue of fact whether Kocarslan had constructed her decks without obtaining a CDP, which was sufficient to prove each of Palos Verdes's claims. Kocarslan asserts this ruling was erroneous for two reasons. First, she contends that because Palos Verdes's claims were "equitably rooted in permanent injunction and declaratory relief," the court was required to apply the clear and convincing standard of proof rather than the preponderance of the evidence standard. Second, she argues there were triable issues of fact whether Palos Verdes would have been made whole by damages, thereby eliminating the need for injunctive relief ordering the removal of the decks. Kocarslan did not raise either of these arguments in the trial court and has provided no explanation for her failure to do so. Accordingly, both arguments are forfeited. (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 ["Failure to raise specific challenges in the trial court forfeits the claim on appeal. "'"[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court'"'"].)

## DISPOSITION

The trial court's judgment is affirmed.  Respondent shall recover its costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


FEUER, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.